IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | CASE NO. 10-32302-H2 |
| WILSHIRE HOMES HOUSTON, LTD. | § | CHAPTER 7 |
| | § | |
| Debtor(s) | § | |
| | § | |
| W. STEVE SMITH, | § | |
| | § | |
| Plaintiff(s), | § | |
| | § | |
| VS. | § | CIV. CASE NO. H-12-1642 |
| | § | |
| JAMES EDWARD HORNE, BRIAN W. | § | |
| BINASH, JACK EDWARD BIEGLER, | § | |
| WICR HOMES, LLC, JEB GUARANTEE, | § | |
| LLC, EAST BELT LTD., BINASH | § | |
| INVESTMENT LIMITED PARTNERSHIP, | § | |
| and WILSHIRE HOMES, LP, | § | |
| | § | |
| Defendant(s) | § | |

## OPINION AND ORDER

Pending before the Court in the above referenced cause,
alleging that Defendants conspired to deprive Debtor Wilshire Homes
Houston, Ltd. ("Debtor") of an opportunity for profit from the
renegotiation of a construction loan in breach of Defendant James
Edward Horne and Brian W. Binash's fiduciary duty to Debtor and
seeking to recover property wrongfully transferred to and received
by Defendants or its equivalent value, are the following matters:
(1) Bankruptcy Judge Marvin Isgur's Report and Recommendation[1]

_____

[1] The Report and Recommendation was entered in Adversary
Proceeding No. 11-3297, related to Bankruptcy Case H-10-32302, *In
re: Wilshire Homes Houston, Ltd.*, (and again as #1 in the above

-1-

referenced H-12-1642) and assigned to this Court because the Plaintiff Trustee's claims fall outside the Bankruptcy Court's constitutional authority. Generally Congress may not withdraw from Article III judges any matter that is the stuff of traditional actions at common law. *Stern v. Marshall*, 131 S. Ct. 2594, 2610 (2011)(5-4)(holding that the bankruptcy court lacked constitutional authority to enter a final judgment on state-law counterclaims for tortious interference with a gift expectancy, asserted by the bankruptcy estate against a creditor, where the claim is a "state law action independent of the federal bankruptcy law and not necessarily resolvable by ruling on the creditor's proof of claim in bankruptcy"; invalidating 28 U.S.C. § 157(b)(2)(C) in this limited respect).

The plurality of the Supreme Court in *Northern Pipeline* recognized an exception to this general rule for a category of cases involving "public rights," which Congress can constitutionally assign to "legislative courts" such as the bankruptcy courts; nevertheless the public rights exception reaches "'only to matters arising between individuals and the Government 'in connection with the performance of the constitutional functions of the executive or legislative departments . . . that historically could have been determined exclusively by those' branches." *Stern*, 131 S. Ct. at 2610, *citing Northern Pipeline Construction Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 67-68 (1982).   In *Northern Pipeline* the plurality observed in dicta that the scheme for restructuring debtor-creditor relations under the Bankruptcy Code "might well be a public right." 458 U.S. at 71. After *Stern*, 131 S. Ct. at 2614 ("We noted [in *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 56 n.11 (1989)] that we did not mean to 'suggest that the restructuring of debtor-creditor relations is in fact a public right.")), in proceedings where the claims are asserted under non-bankruptcy or state law between private parties, application of the public rights exception appears questionable.   The high court in *Stern* specifically held that a counterclaim for tortious interference with a gift expectancy, which Vicky Marshall filed as a compulsory counterclaim to Pierce Marshall's proof of claim in her bankruptcy proceeding, "cannot be deemed a matter of 'public right' that can be decided outside the Judicial Branch." *Stern*, 131 U.S. at 2611. (Congress reserves the judicial power of the United States for Article III courts; bankruptcy courts are Article I courts (among other differences, appointed for 14-year terms, not for life). 131 S.Ct. at 2618-19.).   In 1984 Congress revised the Bankruptcy Act of 1978 and permitted the newly constituted bankruptcy courts to enter final judgments only in "core" proceedings arising under title 11, while only Article III judges may enter final judgment in non-core proceedings.   *Id.* "Congress

(instrument #1 in this case; #128 in the Adversary Proceeding, H-11-03297) that this Court should grant the no-evidence motions for summary judgment on damages filed by two groups of Defendants below: (a) the "Biegler Defendants," comprised of Jack Biegler ("Biegler") and JEB Guarantee, LLC ("JEB")(#111[2] in the Adversary

---

may not bypass Article III simply because a proceeding may have *some* bearing on a bankruptcy case; the question is whether the action at issue stems from the bankruptcy itself or would necessarily be resolved in the claims allowance process." *Id.* at 2618. Because the breach of fiduciary duty issues in the instant Adversary Proceeding are based on state law and are not in any way altered by the bankruptcy law, and thus under *Stern* outside the bankruptcy judge's constitutional authority, the Bankruptcy Court issued a report and recommendation and assigned the motions for summary judgment to the undersigned district court judge for final resolution.

[2] The Biegler Defendants previously filed their first motion for summary judgment (#93), which focused on the alleged fraudulent transfer damages under the Trustee's Second Amended Complaint. In response, with Judge Isgur's leave, the Trustee filed his Third Amended Complaint, which abandoned the fraudulent transfer claims and pursued only claims related to the alleged breach of fiduciary duties. At a hearing on March 8, 2012 (#112, Ex. A, Transcript; also filed as #2-1 in the instant case, H-12-1642) the Biegler Defendants argued that the Trustee could not prove that the estate had suffered any damages. Judge Isgur found that #93 did not clearly state the no-evidence standard for summary judgment nor provide sufficient notice to the Trustee that he had to produce evidence of damages arising from the alleged breach of fiduciary duty rather than the alleged fraudulent transfer. Therefore Judge Isgur denied the first motion for summary judgment and granted the Biegler Defendants leave to file a second no-evidence motion for summary judgment, #111, which seeks summary judgment solely on the question of damages arising from the purported breach of fiduciary duty and related claims. #112-1, Ex. A (Transcript of hearing on March 8, 2012) at p. 32. Both Defendant groups' motions for summary judgment argue that Plaintiff has failed to and cannot establish damages, which are an essential element of all of the remaining causes of action and without which Plaintiff cannot recover. *See, e.g., Anderton v.* Cawley, 378 S.W. 3d 38, 51 (Tex. App.--Dallas 2012)(To prevail on a claim for breach of fiduciary

Proceeding) and (b) the "Horne Defendants," comprised of James Edward Horne ("Horne"), WICR Homes LLC ("WICR"), East Belt Ltd. ("East Belt"), Wilshire Homes, L.P. ("WHLP"), Brian W. Binash ("Binash"), and Binash Investment Limited Partnership ("BILP")(#112 in the Adversary Proceeding); (2) objections to that Report and Recommendation filed by Plaintiff W. Steve Smith (the "Trustee"), Chapter 7 Trustee for the estate of Debtor (#2 in this case); and (3) the Trustee's motion to file out-of-time objection to the Bankruptcy Judge's report and recommendation under Federal Rule of Civil Procedure 60(b)(#6 in H-12-1642).  Defendants' motions for summary judgment in essence argue that the Trustee has not and cannot show that the bankruptcy estate suffered any damages as a result of Defendants' alleged actions and therefore all their claims fail as a matter of law.

    After reviewing the briefing, the record, and the applicable law, for the reasons stated below the Court concludes that the Trustee's motion to file out-of-time objections should be denied, the Trustee's objections to Judge Isgur's report and recommendation should be overruled, Judge Isgur's report and recommendation should

---

duty, a plaintiff must prove that (1) the plaintiff and defendant had a fiduciary relationship, (2) the defendant breached its fiduciary duty to the plaintiff, and (3) the defendant's breach resulted in injury to the plaintiff or benefit to the defendant.); *Abetter Trucking Co v. Arizpe*, 113 S.W. 3d 503, 508 (Tex. App.-- Houston [1st Dist.] 2003, no pet.)(To prove a breach of fiduciary duty a plaintiff must prove the existence of a fiduciary duty, breach of the duty, causation, and damages).

be adopted as the Court's own, and Defendants' motions for summary judgment should be granted.

Initially the Trustee filed this action comprised of state law claims against Defendants on behalf of the Debtor, a Texas limited partnership, which constructed and sold residential homes in the area of Houston, Texas before filing for Chapter 7 bankruptcy in 2010. The Trustee seeks to recover property or its equivalent value, under 11 U.S.C. §§ 541 and 542, on the grounds that Defendants allegedly conspired to and did defraud Debtor and transfer Debtor's assets to an entity owned by Defendants in an attempt to personally profit from them. The Trustee's Original Adversary Complaint (#75 in H-10-32302-H2) asserted ten causes of action: turnover of property of the estate under 11 U.S.C. § 541 and 541, breach of fiduciary duty, aiding and abetting breach of fiduciary duty, equitable subordination, usurpation of business opportunities, conversion of estate assets, violation of the Texas Theft Liability Act, and negligence. The Trustee was permitted to file three Amended Complaints (#29, 50, and 102) in the course of the Adversary Proceeding. The Third Amended Complaint (#102) pared down the Trustee's claims against Defendants.[3] The Court therefore will address motions for summary judgment regarding those claims

---

[3] The Trustee filed a motion for leave to file a Fourth Amended Complaint (#120), but Judge Isgur clearly states that he did not grant the motion (Report and Recommendation at p. 6, p. 14 n.3, and p. 23). More will be discussed about this motion below.

that are still live.

**Allegations of Trustee's Third Amended Adversary Complaint**[4]

The Trustee alleges that Horne and Binash, the two sole managers of Debtor's General Partner, Houston WH GP, LLC ("WHGP"), created a special purpose entity, WICR, on June 11, 2009, a little over a month before the alleged fraudulent transfer, and then used WICR, WHLP, and East Belt (all of which Horne and Binash dominated and controlled) to implement their conspiracy for personal gain through fraudulent conveyances and unauthorized transfers of Debtor's assets.[5]  In light of Horne's and Binash's capacities as officer, director and/or partner of the Debtor and as officer, director, controlling member and/or governing person of WHGP, as well as participants in, or receptors of, benefits of these unlawful transactions (Tex. Bus. Orgs. Code §§ 7.001(c) and 152.801), these transfers constituted a breach of their fiduciary duties to Debtor.[6]  WICR, WHLP, and East Belt are charged with aiding and abetting Horne and Binash in breaching their fiduciary

---

[4] Instrument # 201 in H-11-3297.

[5] Horne controlled a 46.67% partnership interest in Debtor through Defendant WHLP, while Binash controlled a 25.45% partnership interest in Debtor through BILP.

[6] Among the formal relationships which Texas has ruled create fiduciary duties as a matter of law is that of an officer and director to his corporation. *See, e.g., Int'l Bankers Life Ins. Co. v. Holloway*, 368 S.W. 2d 567, 576 (Tex. 1963); *Cotton v. Weatherford Bancshares, Inc.*, 187 S.W. 3d 687, 698 (Tex. App.-Fort Worth 2006, pet. denied).

duty to Debtor.

On November 7, 2008 one of Debtor's primary lenders, Franklin Bank, was placed into receivership by the Federal Deposit Insurance Corporation ("FDIC"). Co-conspirators Horne and Binash believed that bankruptcy was a likely prospect for Debtor and allegedly saw an opportunity to personally profit from the situation. They caused the Debtor to transfer/sell essential assets (36 lots and 18 partially constructed homes) to WICR, serving as an "off-balance-sheet" entity that was owned and controlled by all of the Defendant co-conspirators except JEB and Biegler and that was the primary vehicle for the conspiracy and for liquidating the properties transferred out of Debtor.

Meanwhile the FDIC held a construction loan ("Franklin Bank Note") that was secured by these same properties that were transferred to WICR. Moreover, as part of the purchase price for Debtor's transferred assets and part of the conspiracy, WICR also assumed three insider loans previously made by Horne and Binash to the Debtor.[7] Next Horne and Binash sought a reduction of the balance on the Franklin Bank Note. With the Franklin Bank in receivership, the Debtor's construction loan would be put up for

---

[7] This purchase of their loans by WICR was important to Horne and Binash because, as expected, when Debtor filed for bankruptcy, the co-conspirators would lose their investment along with investments by Debtor's other $5,000,000 plus worth of creditors; to avoid this personal loss, they preferentially provided for themselves through this transfer of the loans to WICR.

sale, but not to the public, and could be sold at a substantial
discount.  Horne and Binash hired a top-dollar consultant to help
them deal with the FDIC and began looking for a bankruptcy attorney
for Debtor.  The FDIC informed them through their negotiator that
the properties had a liquidation value of $3,000,000,[8] but Horne
and Binash knew they were worth much more than this "fire sale"
valuation.   Thus if they could purchase the property at a
significant discount, they could make a nice windfall.

Horne and Binash manipulated the situation so that Franklin
Bank's assets would be sold to WICR, the special purpose vehicle
created, owned, and controlled by Horne and Binash as 50/50
partners who would pay approximately $300,000, which they would
later recover from cash flow.  To conceal their self-dealing, they
told the Trustee during a creditors' meeting that they had found an
outside guarantor with a bank to finance the purchase of the loan
from the FDIC.  That guarantor was actually Horne's close, long-
time associate, Biegler, with whom Horne was a co-member of another
limited liability company.  Biegler then formed another special
purpose entity, JEB, on June 29, 2009, twenty-four days before JEB
ostensibly purchased the Franklin Bank Note from the FDIC.
Biegler, who allegedly aided and abetted the breaches of fiduciary
duty by Horne and Binash, and JEB expected to make about

---

[8] In an email dated June 5, 2009, Horne estimated that the
sale of the assets securing the Franklin Bank loan might bring
$7,728,943 in sales revenue.

$500,000.00 profit for financing the purchase of the Franklin Bank Note.  The FDIC, however, stated that the loan was not initially sold to a third party, but was compromised with the Debtor because the consultant hired by Horne and Binash negotiated the purchase purportedly for the Debtor.  An unrelated third party would have expected to collect the full face value of the Franklin Bank Note from WICR and thereby would have greatly diminished Horne and Binash's recovery.  Since there was no unrelated third party and the balance on the loan at the time when the WICR deal was executed was $6,292,657.00, the co-conspirators, with the help of JEB/Biegler, immediately following the sale of the properties to WICR, managed to write down or reduce the balance owed to $4,322.071.00, even though appraisals dated June 15, 2009[9] showed that the 36 lots and 18 partially completed houses, "as is," had a valuation of $5,815,000.  JEB and Biegler purchased the Note, and the transaction closed on July 24, 2009, when the principal balance on the reduced Note ("WICR Note") was $4,392,770.00.  Binash disclosed the purchase of the Franklin Bank Note by JEB and Biegler, but did not disclose that insiders would benefit from it.  Moreover, Horne and Binash falsely continued to represent that Debtor was still a viable entity, even though it was preparing to file for bankruptcy.

---

[9] The Trustee attaches as Ex. A to the Third Amended Complaint a detailed diagram of the WICR transaction to Binash and Biegler that he emailed to Binash of June 24, 2009.

In sum at the closing of the sale transaction to Biegler and JEB on July 24, 2009, the co-conspirators had (1) transferred essential assets of Debtor's estate off-balance-sheet to WICR, (2) reduced by almost $2,000,000 the outstanding obligation on the properties that would have to be paid back, and (3) placed themselves preferentially in front of Debtor's other creditors regarding their loans to the Debtor.  They only needed to put Debtor and its creditors into bankruptcy to reap their profit.

Debtor filed a voluntary Chapter 7 petition on March 22, 2010, and the Trustee was appointed that same day, first as interim Trustee and later as permanent Trustee.  The Trustee filed this Adversary Proceeding on June 13, 2011.

The Trustee alleges that the Debtor's Statement of Financial Affairs ("SOFA"), signed by Horne and filed in the Bankruptcy Court, misrepresented the transaction.  The SOFA stated that when WICR purchased the properties from the Debtor, WICR "assumed $8,095,228 of the secured debt against the properties that was held by Franklin Bank."  In actuality, the face amount owed to the Bank on the date of sale was $6,292.657, with the balance of the "purchase price" composed of the notes owed to Horne, Binash, and WHLP that were not previously secured by the properties that secured the Franklin Bank loan.  See Ex. A to #102, Horne diagram of the WICR transaction structure.

Furthermore as one additional step in accomplishing their

scheme for personal profit, the co-conspirators needed to strip existing vendor mechanic and materialman's liens from the properties before the transfer of Debtor's assets to WICR because the title company wanted them to and, more importantly, to obtain the maximum profit for themselves when WICR sold the properties to third parties.  Therefore they convinced all of the independent contractors to whom they owed money for work on these properties to join in a "Go Forward" plan and to release their liens on the properties in order to save Debtor.  These contractors did not know that Horne and Binash intended to transfer ownership of the real properties from Debtor to WICR before throwing Debtor and all of its creditors into bankruptcy.  Horne and Binash signed at the bottom of the Bill of Sale and Assignment from the Debtor to WICR, with Horne signing for WICR and Binash, for the Debtor.  The same was true on the Assumption Agreement.

The Third Amended Complaint asserts seven causes of action: (1) breach of fiduciary duty against Horne and Binash; (2) aiding and abetting breach of fiduciary duty against Biegler, WICR, JEB, East Belt, BILP, and WHLP; (3) equitable subordination under 11 U.S.C. § 510(c) against Horne, Binash, WHLP and BILP as insiders of the Debtor and majority shareholders of Debtor who or which had an obligation to make every effort to resolve Debtor's deteriorating financial condition and avoid dissipating Debtor's assets through illegal and improper distributions to insiders and controlling

entities; (4) usurpation of Debtor's business opportunities for personal gain against Horne and Binash[10]; (5) conversion of estate assets against Horne, Binash, WICR, BILP, East Belt, and WHLP; (6) violation of the Texas Theft Liability Act, Tex. Civ. Prac. & Rem. Code § 134.001, *et seq.*, against Horne, Binash, WICR, BILP, East Belt, and WHLP; and (7) negligence against Horne and Binash. Trustee further seeks attorney's fees under Tex. Civ. Prac. & Rem. Code § 134.005 and Tex. Bus. & Com. Code § 24.013, and exemplary damages under Tex. Civ. Prac. & Rem. Code § 41.003(a).

The Third Amended Complaint seeks to recover as damages to Debtor an amount

> at a minimum, equal to the difference between the value
> of the properties at the time of the transfer from Debtor
> to WICR and the amount of the purchase price of the
> Franklin Bank loan, which was secured by the properties,
> from the FDIC.  On information and belief, the value of
> the 36 lots and 18 partially completed homes transferred
> to WICR was at least $7,728,942 at the time of transfer.
> Additionally, according to Horne's 341 testimony, the
> purchase price paid to the FDIC for the Franklin Bank
> loan was $3,500,000.  Hence Plaintiff is entitled to
> damages of not less than $4,228,942.

#102 at pp. 14-15.

## Motions For Summary Judgment

## I.  Standard of Review

---

[10] "The usurpation of corporate opportunities doctrine does not apply to all corporate fiduciaries.  Only officers, directors, and major shareholders who are fiduciaries can be liable for usurpation of corporate opportunities."  *In re Yazoo Pipeline Co. L.P.*, 439 B.R. 636, 655 (Bkrtcy. S.D. Tex. 2011), *citing United Teachers Assocs. Ins. Co. v. MacKeen & Bailey, Inc.*, 99 F.3d 645, 651 (5th Cir. 1996).

Summary judgment under Federal Rule of Civil Procedure 56(c) is appropriate when "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A fact is material if it might affect the outcome of the suit under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute of material fact is "genuine" if the evidence would allow a reasonable jury to find in favor of the nonmovant. *Id.* The court must consider all evidence and draw all inferences from the factual record in the light most favorable to the nonmovant. *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986); *National Ass'n of Gov't Employees v. City Pub. Serv. Board*, 40 F.3d at 712-13.

The application of the rule depends upon which party bears the burden of proof at trial. If the movant bears the ultimate burden at trial, the movant must provide evidence to support each element of its claim and demonstrate the lack of a genuine issue of material fact regarding that claim. *Rushing v. Kansas City S. Ry.*, 185 F.3d 496, 505 (5th Cir. 1999), *cert. denied*, 528 U.S. 1160 (2000).

If the nonmovant bears the burden of proof at trial, as is the case here, the movant may either offer evidence that undermines one

or more of the essential elements of the nonmovant's claim or point out the absence of evidence supporting an essential element of the nonmovant's claim; the movant may, but is not required to, negate elements of the nonmovant's case to prevail on summary judgment. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)("[T]here can be no 'genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."); *Lujan v. National Wildlife Federation*, 497 U.S. 871, 885 (1990); *Edwards v. Your Credit, Inc.*, 148 F.3d 427, 431 (5th Cir. 1998); *International Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1264 (5th Cir. 1991); *Saunders v. Michelin Tire Corp.*, 942 F.2d 299, 301 (5th Cir. 1991).

If the movant meets this burden, the nonmovant must then present competent summary judgment evidence to support each of the essential elements of the claims on which it bears the burden of proof at trial and to demonstrate that there is a genuine issue of material fact for trial. *National Ass'n of Gov't Employees v. City Pub. Serv. Board*, 40 F.3d 698, 712 (5th Cir. 1994). "[A] complete failure of proof concerning an essential element of the nonmoving party's case renders all other facts immaterial." *Celotex*, 477 U.S. at 323.

"'[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion

for summary judgment . . . .'" *State Farm Life Ins. Co. v. Gutterman*, 896 F.2d 116, 118 (5th Cir. 1990), *quoting Anderson v. Liberty Lobby, Inc.*. 477 U.S. 242, 247-48 (1986). "Nor is the 'mere scintilla of evidence' sufficient; 'there must be evidence on which the jury could reasonably find for the plaintiff.'" *Id., quoting Liberty Lobby*, 477 U.S. at 252. The Fifth Circuit requires the nonmovant to submit "'significant probative evidence.'" *Id., quoting In re Municipal Bond Reporting Antitrust Litig.*, 672 F.2d 436, 440 (5th Cir. 1978), and *citing Fischbach & Moore, Inc. v. Cajun Electric Power Co-Op.*, 799 F.2d 194, 197 (5th Cir. 1986); *National Ass'n of Gov't Employees v. City Pub. Serv. Board*, 40 F.3d at 713. Conclusory statements are not competent evidence to defeat summary judgment. *Turner*, 476 F.3d at 346-479 (plaintiff "must offer specific evidence refuting the factual allegations underlying [defendant's] reasons for her termination), *citing Topalian v. Ehrman*, 954 F.2d 1125, 1131 (5th Cir. 1992). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Thomas v. Barton Lodge II, Ltd.*, 174 F.3d 636, 644 (5th Cir. 1999), *citing Celotex*, 477 U.S. at 322, and *Liberty Lobby*, 477 U.S. at 249-50.

Judge Isgur's Report and Recommendation referenced the pending motions for summary judgment as no-evidence motions for summary judgments under Texas Rule of Civil Procedure 166a(i), which provides,

> After adequate time for discovery, a party without
> presenting summary judgment evidence may move for summary
> judgment on the ground that there is no evidence of one
> or more essential elements of a claim or defense on which
> an adverse party would have the burden of proof at trial.
> The motion must state the elements as to which there is
> no evidence.  The court must grant the motion unless the
> respondent produces summary judgment evidence raising a
> genuine issue of material fact.

A no-evidence motion is essentially a motion for a pretrial
directed verdict with the same legal sufficiency standard of
review. *King Ranch, Inc. v. Chapman*, 118 S.W. 3d 742, 750-51 (Tex.
2003).  The court must view the evidence in the light most
favorable to the nonmovant and must disregard all contrary evidence
and inferences.  *Id.* at 751.  A genuine issue of material fact is
raised if the nonmovant produces more than a scintilla of evidence
regarding the element at issue.  *Id.*  If the evidence fails to
constitute a mere scintilla, it is legally no evidence at all.
*Lozano v. Lozano*, 52 S.W. 3d 141, 148 (Tex. 2001).  Unlike a motion
for summary judgment under Federal Rule of Civil procedure 56,
where the movant always bears the initial burden of proof,[11] under
Texas Rule of Civil Procedure 166a(i) the nonmovant has the burden
of proof to establish a genuine issue of material fact for trial.

---

[11] *Celotex*, 477 U.S. at 323 (under Rule 56, the movant "bears
the initial responsibility of informing the district court of the
basis for its motion, and identifying those portions of the
[record] which it believes demonstrate the absence of a genuine
issue of material fact"); *id.* at 328 (White, J., concurring)("[I]t
is not enough to move for summary judgment without supporting the
motion in any way or with a conclusory assertion that the plaintiff
has no evidence to prove his case.").

Regardless of the distinct standards under the state and federal procedural rules and the nonmovant's heavier evidentiary burden under Rule 56, "'no evidence' motions for summary judgment are not cognizable in federal court, but proper only in Texas State court. *See, e.g., In re Perry (Perry v. One Sugar lakes Professional Centre, L.P.*), Bkrtcy. No. 08-32362-H4-11, Adv. No. 08-03465, 2009 WL 2753181, at *2-3 (S.D. Tex. Aug. 26, 2009)(Bohm, J.)("the no-evidence standard does *not* apply in federal courts"); *Trautmann v. Cogema Mining, Inc.*, Civ. A. No. 5:04-cv-117, 2007 WL 1577652, at *2-3 (S.D. Tex. May 30, 2007); *Castenada v. Flores*, Civ. A. No. 5:05-CV-129. 2007 WL 1671742, at *2 (S.D. Tex. June 8, 2007)(state of Texas's "no evidence" standard does not apply in federal court).   Accordingly the motions for summary judgment should be reviewed under the federal standard.

Moreover, the bankruptcy court issued its opinion as a Report and Recommendation that this Court grant Defendants' motions for summary judgment as a matter of law, pursuant to *Stern v. Marshall*, 131 S. Ct. 2594 (2011).   The Trustee, in his objections to the Report and Recommendation (#2 at pp. 2), notes that in the wake of *Stern* he is "somewhat uncertain and can find no definitive precedent or legal guidance concerning the proper procedure for preserving issues for appeal and triggering the *de novo* review standard afforded objecting parties in other contexts.  He presumes

> that the procedural process of this case is analogous to a review by the District Court of a Magistrate's Findings

-17-

> and Recommendations.  When either party objects to any
> portion of a Magistrate Judge[']s Findings and
> Recommendations concerning a dispositive motion, the
> District Court must make a *de novo* determination of that
> portion of the Magistrate's report.  28 U.S.C. §
> 636(B)(1); Fed. R. Civ. P. 72(b); *Habets v. Waste
> Management, Inc.*, 363 F.3d 378 (5th Cir. 2004).

*De novo* review is appropriate for objections to a Magistrate
Judge's report and recommendation regarding motions for summary
judgment, as provided in the statute, 28 U.S.C. § 636(b)(1)("A
judge of the court shall make a de novo determination of those
portions of the report or specified proposed findings or
recommendations to which objection is made.").  *In accord Dietz v.
Spangenberg*, Civ. No. 11-2600 ADM/JJG, 2013 WL 883464, at *4 (D.
Minn. Mar. 8, 2012).

Moreover, following the issuance of *Stern*, a number of courts
have applied a *de novo* review to a bankruptcy court's report and
recommendation.  *See, e.g., In re Stewart*, Civ. A. No. 12-1243,
Bankr. No. 10-26939, Adv. Proc. No. 10-2654, 2013 WL 4041963, at *3
(S.D. Pa. Aug. 8, 2013)("Even if *Stern* would preclude the
bankruptcy court from entering a final order, the district court
may consider the bankruptcy court order as a report and
recommendation and review it *de novo*."); *In re Eberts*, 2012 WL
34667114, *1 (C.D. Cal. July 10, 2013)("The Court need not reach
the *Stern v. Marshall* issue concerning whether the Bankruptcy Court
could enter judgment; the review in this Court would be *de novo*
regardless whether it reviewed a judgment or a report and

recommendation."); *In re Cavalry Const., Inc.*, ___ B.B. ___, 2013 WL 1972235, at * n.3 (S.D.N.Y. May 13, 2013)("[E]ven if the bankruptcy court here were without power to enter final judgment under *Stern*, this Court could treat the judgment as a report and recommendation from the bankruptcy judge subject to de novo review in this Court."), *citing Retired Partner of Coudert Bros. Trust v. Baker & McKenzie,* LLP, No. 11-cv-2785, 2011 WL 5593147, at *13 (S.D.N.Y. Sept. 23, 2011)("[T]here is no reason not to treat what [the bankruptcy judge] thought was a 'final' determination dismissing the Claims as a report and recommendation of dismissal, which [the district court] will review de novo.").

Nevertheless as noted, the motions for summary judgment in this case revolve around whether the estate suffered any damages from the alleged wrongful transfer of estate assets, an essential element of all the Trustee's causes of action.[12] Under the federal

---

[12] Although the parties do not cite authority for this proposition, Judge Isgur goes through the Trustee's causes of action in the fourth Amended Complaint and does so. For breach of fiduciary duty, he cites *Davis v. West*, 317 S.W. 3d 301, 311 (Tex. App.--Houston [1st Dist.] 2009)(*citing Martin v. Estates of Russell Creek Homeowners Ass'n, Inc.*, 251 S.W. 3d 899, 904 (Tex. App.--Dallas 2008)); for equitable subordination, *Wooley v. Faulkner (In re SI Restructuring, Inc.*), 532 F.3d 355, 361 (5th Cir. 2008)("equitable subordination is remedial, not penal, and in the absence of harm, equitable subordination is inappropriate") (*citing Benjamin v. Diamond (In re Mobile Steel Corp.)*, 563 F.2d 692, 706 (5th Cir. 1977)); for conversion, *Alan Reuber Chevrolet, Inc. v. Grady Chevrolet, Ltd.*, 287 S.W. 3d 877, 889 (Tex. App.--Dallas 2009, no pet.); for usurpation of business opportunities, *Lifshutz v. Lifshutz*, 199 S.W. 3d 9, 19 (Tex. App.--San Antonio 2006)(*citing Int'l Bankers Life Ins. Co. v. Holloway*, 368 S.W. 2d 567, 577 (Tex. 1963)); for violation of the Texas Theft Liability

standard, "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."). *Celotex*, 477 U.S. at 323.

## II. The Damages Issue

As noted, the Third Amended Adversary Complaint seeks damages (the estate's loss of profits) "at a minimum, equal to the difference between the value of the properties at the time of transfer from Debtor to WICR [at least $7,728,942.00] and the

_____

Act, Tex. Civ. Prac. & Rem Code §§ 134.003(a) and 134.005, and *Alcatel, USA, Inc. v. Cisco Sys., Inc.*, 239 F. Supp. 2d 660, 674 (E.D. Tex. 2002); and for negligence, *Hudspeth Enterprise Life Ins.*, 358 S.W. 3d 373, 391 (Tex. App.--Houston [1ˢᵗ Dist.] 2011, no pet.). #1, at pp. 14-15. This Court would add that for aiding and abetting a breach of fiduciary duty, a plaintiff must prove '(1) the existence of a fiduciary relationship; (2) the fiduciary breached [his] duty; (3) a defendant, who is not a fiduciary, knowingly participated in the breach; and (4) damages to the plaintiff resulted from the concerted action of the fiduciary and the nonfiduciary.'" *In re Parkcentral Global Litig.*, 884 F. Supp. 2d 464, 481 (N.D. Tex.2012).

Judge Isgur further observed (#1, p. 14 n.3), that a plaintiff may

> recover for breach of fiduciary duty under an equitable disgorgement theory without proving actual damages. *Alpert v. Riley*, 274 S.W. 3d 277, 295 (Tex. App.--Houston [1ˢᵗ Dist.] 2008). The Trustee's Third Amended Complaint does not seek equitable disgorgement. . . . The Trustee's proposed Fourth Amended Complaint seeks to add an equitable disgorgement theory against the Biegler Defendants, but . . . the Court has not granted leave to amend.

Because the Fourth Amended Complaint is therefore not properly on file, the Court does not address the Trustee's arguments in response to the motion for summary judgment that the Debtor is entitled to disgorgement of the profit or of the fee of the Biegler Defendants as joint tortfeasors with Horne and Binash.

-20-

amount of the purchase price of the Franklin Bank loan that was
secured by the properties from the FDIC [$3,500.00]." Thus
Plaintiff Trustee seeks damages in an amount not less than
$4,228.942.

At a summary judgment hearing on March 8, 2012 (see footnote
2), Judge Isgur stated that actual damages would be measured by the
amount of profit that had purportedly been diverted from the
estate, based on a comparison of the investment in WICR with the
proceeds WICR had received or was expected to receive. He
explained, #1 in this suit at p. 8,

> The difference between the estimated value of the
> Properties at the time of the transfer and the purchase
> price of the Franklin Bank Note is not an accurate
> measure of lost profits. The WICR transaction required
> cash contributions from the Horne Defendants, and simply
> subtracting the amount owed on the Note from the
> estimated value of the Properties would not have produced
> an accurate estimate of profits even at the time of the
> transaction. The Properties ultimately sold for less
> than their estimated values, and costs were greater than
> anticipated. The question is not whether the Defendants
> expected a profit at the time of the transaction[13]; the
> question is whether the Debtor would *actually* have
> profited from retaining the Properties and benefitting
> from the reduction of the Franklin Bank Note.

The Court agrees.

**III. Biegler Defendants' Motion for Summary Judgment On Damages
Resulting from Alleged Breach of Fiduciary Duty (#111)**

---

[13] In a footnote, Judge Isgur points out, "The Defendants'
expected profits at the time of the transaction would have been
relevant to a determination of the Defendants' state of mind. But
the Defendants' state of mind is not relevant to the question of
whether the Trustee can prove actual damages." #1, p. 8 n.1.

Biegler Defendants argue that there is no evidence that Debtor suffered any damage as the result of Horne's and Binash's breach of fiduciary duty and the Debtor would not have received any benefit if the transaction was completely separate from the involvement of the two men because the amount of debt and carrying costs owed by WICR to JEB, plus the new cash contributed to WICR by Horne and Binash, is greater than the value of the remaining homes and lots and escrowed funds from previous sales, demonstrated by the Biegler Defendants as follows.

**A.  As of April 30, 2012, the amount of outstanding principal, accrued interest, and nonlegal expenses due to JEB under the WICR Note is $1,026,779.**  #111, Ex. A, WICR Note Summary with supporting affidavit of Jack Biegler.  Attorney's fees are not included in this amount because Judge Isgur indicated that he would not consider fees in calculating the damages.

**B.**  To close the WICR transaction with WICR as a separate entity, **Horne and Binash, directly or through the entities that they controlled, were required to make cash contributions to WICR or to provide certain security which was subsequently applied to the WICR Note as follows**:

| | |
|---|---|
| Ed Horne CD | $250,000 |
| Initial Funds from Horne and Binash | $429,448 |
| Funds advanced by Horne after WICR closing | $ 19,866 |
| Funds advanced by Horne and Binash in 2011 | $  7,748 |
| Total cash invested by Horne and Binash | $707,062 |
| One-time distribution to Horne and Binash (Dec. '09) | ($ 50,000) |

        **Total Unreimbursed Cash Invested By**
                          **Horne and Binash**          **$657,062**

        **C.   The Value of the Remaining Collateral is $ 1,353,547**,
based on the following.  First, since the filing of this Adversary
Proceeding, the proceeds from the sale of WICR collateral have been
held in an escrow account pending the outcome of this litigation.
As of March 13, 2012, the balance in the escrow account was
$855,161.36.  #111, Ex. B, email dated March 13, 2012 from Deborah
Weaver at Stewart Title.  Second, the sole remaining house is under
contract for $240,000, and is expected to net an estimated $195,783
when it closes on April 30, 2012 (Ex. C.) based on the following:

        Sales Price                                $240,000
        Estimated Commissions, Closing Costs       ($ 28,800)
        Completion Costs                           ($ 10,000)
        Estimated Taxes and HOA[14]                ($  5,417)
        **Net Proceeds**                           **$195,783**

Third, of the seven unsold lots, three are in the Bella Terra
subdivision and are under contract for sale at a price of $50,500
each, for a total of $151,500. #111, Ex. E, Lot Sale and Purchase
Contract. With total closing costs of 2%, taxes, and HOA fees of
2.5%, the **net from the sales will be approximately $144,683**.
Fourth, the **remaining four lots are listed for sale** at $42,000; if
they sell for the full price, and assuming closing costs of 2% and
taxes and HOA fees of 2.5%, they **would net approximately $160,440**.
**In sum, the total value of the remaining collateral is $1,353,547**

---

[14] Homeowners Association fees.

-23-

based on the following figures:

| | |
|---|---|
| Escrowed Funds | $855,161 |
| Home | $195,783 |
| Pending Lots | $144,683 |
| Remaining Lots | $157,920 |
| **Total** | **$1,353,547** |

Biegler Defendants contend that **the Trustee cannot prove damages because the total debt remaining under the WICR Note, plus the unreimbursed cash contributions from Horne and Binash to WICR, is $1,683.84.** This amount is greater than the most optimistic view of the value of the remaining collateral by approximately $330,294. The Trustee cannot show that the Debtor sustained any damages as a result of the alleged breach of fiduciary duty because there would be no excess value above the contributions made by Horne and Binash. Furthermore each day after April 30, 2012 results in increases of the debt balance, accrued taxes, and HOA fees. Thus the Court should grant summary judgment in favor of the Biegler Defendants and dismiss this action with prejudice.

## IV. Horne Defendants' Motion for Summary Judgment (#112)

Referencing the Biegler Defendants' motion for summary judgment and the evidence attached to it, as well as the documents attached to their own, Horne Defendants also maintain that the Trustee has not and cannot establish the existence or amount of any damages as a matter of law and, alternatively, the summary judgment evidence submitted by Movants conclusively establishes that there are no damages that can be recovered in this case. With slightly

different numbers regarding the value of the remaining collateral and remaining debt on the WICR Note than those provided by the Biegler Defendants, they, like the Biegler Defendants, insist that there is no profit that could serve as the basis for damages because there are not enough funds to pay the Biegler debt and provide recovery for funds contributed by Horne, Binash or their affiliates.  Summary judgment should be granted where the plaintiff cannot establish damages or has no competent evidence of damages. *Super Future Equities, Inc. v. Wells Fargo Bank, Minnesota, S.A.*, Civ. A. No. 3:06-CV-0271-B,2007 WL 4410370, at *15-16 (S.D. Tex. Dec. 14, 2007).  "Texas law requires that damages be established with a reasonable degree of certainty. . . . Although damages need not be established with mathematical precision, the evidence must provide a basis for reasonable inferences."  *Dill v. Adams*, 167 F.3d 945, 946-47 (5th Cir. 1999).  Horne Defendants argue that Plaintiff has not and cannot establish any damages with any degree of certainty; instead the summary judgment evidence establishes the contrary.

**V.  Trustee's Response in Opposition (#119)**

Stating that the arguments of the Biegler Defendants and the Horne Defendants are virtually "identical," the Trustee files a single response to both motions.  While Defendants maintain that WICR will not make any profit from the transaction, the Trustee

contends that but for Horne's and Binash's breach of fiduciary duty, Debtor would have realized an ultimate net benefit from the WICR transaction of between $147,014.92 and $149,534.92,[15] which constitutes actual damages to Debtor's estate.   The Trustee concedes that the profit was far less than the $200,000,000 which the Horne and Biegler Defendants had expected to realize, but it was profit nonetheless.

The Trustee indicates that he is willing to accept either of the Defendant groups' valuation models for the value of the remaining collateral (unsold house and seven lots) because each is a reasonably probable output value for calculating the benefit the Debtor could have realized from the WICR transaction, as well as for the current value of the JEB note.   He does disagree with the amount claimed by the Horne Defendants as unreimbursed cash contributed by Horne and Binash, however.   He maintains that if Defendants contributed their own cash to facilitate the transaction and make it possible, the amount is an input that must be balanced against the outputs, i.e., revenue generated by the WICR transaction.   If, however, the cash contributed by Horne and Binash was the Debtor's own money and Defendants lowered their initial investment requirement at the expense of the Debtor to reap a larger profit, that amount must be viewed as an offset to the out-

---

[15] The Trustee states the "benefit" as a range because of the slightly different valuations of the remaining properties by the Horne Defendants and the Biegler Defendants.

of-pocket contributions of Horne and Binash in determining what ultimate benefit would have inured to the Debtor from the WICR transaction.

While the Trustee does not contest that Horne put up a $250,000 Certificate of Deposit that was subsequently used to pay a Texas Capital loan nor that Horne advanced $19,866 through a wire transfer from Eastbelt, Ltd. on April 12, 2011 to fund WICR, he does object to Defendants' claims that Horne and Binash each contributed $214,734.48 to WICR either to fund the transaction or as necessary operational expenses for WICR, because the record shows that while each man deposited that amount in the WICR bank account on July 21, 2009, only $145,000 was actually used to facilitate the WICR transaction. The records of Stewart Title, which conducted the closing of the WICR transaction on July 24, 2009, reflect there were actually four separate transactions closed on that date that related to the transfer of the properties in the Franklin Bank collateral package to WICR and the financing of the transaction. HUD-1 forms, Exs. 5-8. The $145,000 was the only out-of-pocket contribution from the Horne Defendants used to close the WICR transaction, shown as a "Deposit" on line 208 of the HUD-1 form for file no. 09310278A, Ex. 5, as confirmed by Stewart Title's Escrow Accounting File Ledger (Ex. 9) and by the WICR bank statement showing only one outgoing wire transfer to Stewart Title in the amount of $145,000 at the time of closing (Ex. 10, July 2009

-27-

IBC Bank Statement for WICR Homes, LLC); Ex. 12, Contract of Sale,
Bates nos. TMK-Stewart-001978-001993.   A pro forma produced by
Biegler dated June 24, 2009 shows that he anticipated only $137,225
in cash to be required at closing.   Ex. 11, Bates nos. JEB0000226-
233.   The Contract of Sale signed by Binash at the closing shows
that was the amount of the cash portion of the purchase price.   Ex.
12, Bates nos. TMK-Stewart-001978 to -001993.   The same $137,225
amount was included in the cash portion of the purchase price when
WHH filed its SOFA in this Court.   Ex. 13.   Both the Contract of
Sale and the SOFA show that the rest of the purchase price was made
up of debt assumed by WICR.   Despite SOFA's and the Contract of
Sale's misrepresentation that there was additional cash required to
close the WICR transaction, that additional cash was provided by
the Debtor.

Specifically on July 24, 2009 when the WICR transaction
closed, Chicago Title held in escrow proceeds from previous sales
of properties owned by the Debtor that were contributed to the WICR
closing.   Chicago Title made seven transfers, totaling $175,950.98
to Stewart Title on that date.   Ex. 9, Stewart Tittle's Escrow
Accounting Film Ledger; Ex. 5, l. 405 of HUD-1 for file no.
09310278A, "Deposit from Seller"; Ex. 3, Horne Dep., p. 167, ll. 3-
17.   The remaining funds for closing the WICR transaction were
supplied from loan proceeds borrowed by WICR from JEB, not new
money from the Horne Defendants.   Ex. 5, line 303 of HUD-1 for file

no. 09310278A, $256,722,98 as cash required from borrower, i.e., WICR.  Although the Horne Defendants claim in their motion for summary judgment that the amounts they deposited into WICR's bank account over the $145,000 used for the WICR transaction were used "to pay lien claims, provide funding to Wilshire Homes Houston ("WHH") and to liquidate assets [#112 at p.3 n.1]," the evidence shows otherwise.  The only lien claims paid at the WICR closing were to the two vendors (Wisenbaker Builder Services, Inc. and Villarreal Drywall, Inc. and Royal Villa Construction), which had not agreed to accept promissory notes in exchange for their mechanic's liens on the Franklin Bank collateral properties.  The $145,000 from the Horne Defendants and the $175,950.98 from the Debtor were provided at the closing specifically to satisfy the liens of these two entities, according to a letter to Stewart Title's closing agent from counsel for Debtor and counsel for Chicago Title.  Ex. 14 ("The [Chicago Title Insurance Corporation Funds and the Wilshire Homes Houston, Ltd. Funds] constitute the *Escrowed Funds*."  The Escrowed Funds are to be used to satisfy the liens and claims of Wisenbaker and Villareal as described herein.").  Stewart Title's Escrow Accounting File Ledger (Ex. 9) does not show payments to any other Lienholders.  Mike Brown, the loan officer with Texas Capital Bank which funded the JEB loan, stated that the properties were transferred "free and clear" to WICR.

The Trustee contends that the money deposited in the WICR bank account by Horne and Binash that was over the $145,000 used in the closing was not used to liquidate assets, as they claimed, as evidenced by the facts that (1) WICR received funds from the closing and from an asset sale four days after the closing that could apply toward liquidating the rest of the WICR assets; and (2) the funds above the $145,000 were transferred out of WICR's bank account almost immediately after they were deposited.  Indeed WICR had operating capital from the beginning without any additional inputs of money from the Horne Defendants.  At the closing of the WICR transaction, $84,979.62 was transferred to WICR's bank account as the remaining portion of the "First Draw" for WICR's use for operations.  Ex,. 7, HUD-1 for Stewart Title File No. 09310278C, l. 303; Ex. 10.  In addition, WICR closed the sale on one of the properties, 7418 Dresden Ave., Sugar Land, Texas, on July 28, 2009 and $57,332.15 was disbursed to WICR.  Ex. 16, HUD-1, l. 603, Bates number JEB0000487.

Furthermore, on July 22, 2009 Horne and Binash transferred out of WICR's account to the account of WHH $279,854.38 in two wire transfers (in the amounts of $152,897.86 and $51,956.52), which were coded in the general ledger as "Initial Loan--WICR to WHH." Ex. 17, WICR General Ledger, Bates Nos. TMK-WICR05815 to 0856; Ex. 10.  WICR's general ledger and bank account statement also reflect that on August 21, 2009, $24,000 was transferred out of WICR's

account and coded in the ledger as "Disburse to partners-xfr to W."
Ex. 17; Ex. 18, Aug. 2009 IBC Banks Statement for WICR.  WICR's
general ledger and bank account statement further reflect that
$45,000 was transferred out of WICR's bank account and coded in the
ledger as "Disburse to partners-xfr to WH." *Id*.  The Trustee
emphasizes that any new money provided by the Horne Defendants
above the $145,000 used in the WICR closing to keep Debtor afloat
is not an input in the WICR transaction profitability calculation,
even if it was funneled through WICR's bank account, because it was
not used for any purpose relating to the WICR transaction.  The
Trustee observes that $204,854.38, which had been deposited in
WICR's bank account, was transferred out before the WICR
transaction closed, while the other $69,000 in transfers were coded
as a disbursement to the partners in WICR's own ledger.  The
Trustee maintains that the only possible connection that these
funds had to WICR is that they flowed through the conduit of WICR's
bank account, which the Horne Defendants had admitted they had
over-funded.

    The Trustee argues that the evidence of inputs and outputs of
the WICR transaction support his claim for actual damages because
it shows that the output from the WICR transaction exceeds the new
cash inputs by more than $147,014.92.  At minimum, he insists, the
evidence supports facts upon which reasonable minds can differ and
should preclude summary judgment.

The Trustee also contends that a presumption of unfairness of the WICR transaction applies to the Biegler Defendants, who are joint tortfeasors and equally liable for the breach of fiduciary duty by Horne and Binash. *Kinzbach Tool Co. v. Corbett-Wallace Corp.*, 138 Tex. 565, 573-75, 160 S.W. 2d 509, 514 (1942)("It is settled as the law of this State that where a third party knowingly participates in the breach of duty of a fiduciary, such third party becomes a joint tortfeasor with the fiduciary and is liable as such."). An aider and abettor, even if he is a nonfiduciary, has the burden to prove the entire fairness of the transaction just as the principal wrongdoer does. *See generally ASARCO LLC v. Americas Mining Corp.*, 396 B.R. 278 (S.D. Tex. 2008).[16] Horne and Binash as officers of Debtor had a fiduciary relationship with Debtor. The Biegler Defendants, as aiders and abettors of Horne's and Binash's breach of fiduciary duty have the same burden of proof. *Id.* at 407. As parties to the WICR transaction, where Debtor was on the other side of the transaction, there is an equitable presumption that the transaction was unfair to the party who did not profit or benefit from the transaction, i.e., the Debtor. *Stephens City Museum, Inc., v. Swenson*, 517 S.W. 2d 257, 260 (Tex. 1974). The presumption of unfairness with regard to a breach of fiduciary duty claim shifts both the burden on producing evidence and the burden of persuasion from Plaintiff to Defendants. *Moore v. Texas Bank &*

---

[16] This Court observes that *ASARCO* applies Delaware law.

-32-

*Co.*, 576 S.W. 2d 691, 695 (Tex. App.--Eastland 1979)(where a fiduciary relationship exists, the fiduciary must produce evidence of "fairness" to rebut the presumption that all transactions that occurred within that relationship were unfair to the beneficiary), *reversed on other grounds*, 595 S.W. 2d 502 (Tex. 1980).  The Trustee insists Horne and Binash have failed to satisfy their burden.  Even if the burden of proof remained with the Trustee, he insists that his evidence satisfies the burden as to liability and damages.

Finally, charging usury disguised as interest when added to the interest rate for the loan, the Trustee contends that the $500,000 fee paid to Biegler was in actuality a payment for his agreement to guarantee JEB's loan obligation to Texas Capital Bank and consideration paid to JEB, not WICR.  Thus it was a cost of JEB's business activities and, as a matter of law, interest for the purposes of determining usury.  The Trustee argues that JEB contracted for, charged, and received interest on the Note in an amount and at a rate that exceeded the lawful maximum permitted by law, after spreading the interest, including the fee, over the one-year term of the Note.  He claims that from July 2009 through July 2010, JEB contracted for, charged, and received interest that exceeded the lawful maximum by $66,103.77 and that it should be subject to penalties under Sections 305.003 of the Texas Finance Code in addition to reasonable attorney's fees set by the Court

-33-

under Section 305.005.  Ex. 25.

**V.  Biegler Defendants' Reply (#122) to #119**

The Biegler Defendants identify and focus on three components of the calculation of damages here about which the Trustee attempts to raise factual issues:  (1) the $429,468.96 transferred to WICR from Horne, Binash, and their related entities; (2) the $500,000 constituting the Biegler Defendants' return for financing the purchase of the Franklin Bank Note; and (3) the $175,950.98 allegedly contributed by the Debtor to the closing.  The Biegler Defendants address only the last two and leave the first for the Horne Defendants.

Regarding the $500,000 profit of the Biegler Defendants' return on their capital, the Biegler Defendants point to Judge Isgur's comments to counsel for the Trustee during the March 8, 2012 hearing (Transcript #2-1 in H-12-1642, at p. 29, ll. 1-9, 17-25), raising the question whether the $500,000 return component was in excess of the market rate at the time of the WICR Transaction:

> And if you-all want to in responding to it argue that the amount they are owed is not a market amount that they are owed and that you could have done better, I'm going to need some evidence on that.  Mr. Biegler, JEB – if they came in and they did the deal that wasn't at market, you're going to have a relatively heavy burden to show me that he got paid something that was different than market . . . . [A]nd so I'm assuming in the absence of any evidence to the contrary that Mr. Biegler negotiated and that Horne and Binash negotiated as hard as they could to get a market rate on their deal.
> So if there's profit or interest or fees built in, there should be.  You know, this is not a low-risk deal and he's entitled to substantial profits if that's what

> the market was for the deal.  He's not entitled to more
> than that but he's entitled to a market profit.

The Biegler Defendants argue that the Trustee has not addressed the no-evidence issue raised by Judge Isgur because it is undisputed that no other party committed to providing the financing necessary to facilitate the WICR transaction.  The few parties that issued term sheets did not go beyond that stage, and all of those term sheets required higher payments to the proposed lenders and were less beneficial to the Debtor than the Biegler Defendants's deal. Ex. A, Transcript of Horne's deposition at p. 151:21–153:12 (testifying that 10-12 parties were approached regarding financing for the WICR transaction and that no party other than the Biegler Defendants offered any committed financing).  Thus it is undisputed that the loan transaction by JEB to WICR was the best the market was able to provide and was *de facto* a market-based loan.  The Court agrees that despite Judge Isgur's notice, the Trustee has failed to produce evidence that the $500,000 was not the market rate.

Moreover the Biegler Defendants argue that, in response to the Trustee's "red herring" usury argument, the Trustee has no standing to assert that a loan from JEB to WICR, to which the Debtor is not a party, is usurious.  They further correctly point out that the Trustee is also trying to bootstrap the usury argument to a new claim for disgorgement as a remedy, which, as noted earlier, he has not been granted leave to plead.

Regarding the Trustee's input-output calculations on page 4 of his response (#119), the Biegler Defendants argue that the Trustee erroneously deducts $175,950.58[17] in escrowed funds contributed by Chicago Title to the WICR closing, held in escrow from prior closings on sales of properties owned by Debtor and used to pay construction lienholders for their liens on the secured properties. They insist that there is no version of events where that money would have been paid from the Chicago Title escrow to the Debtor. Had the funds not been available to pay the lien creditors, additional funds would have had to have been advanced by the Biegler Defendants at closing to make the payments, resulting in a higher loan balance at that time.  No matter what the transaction looked like or how it was structured, that money would always have been used to pay the construction lienholders.  Therefore the funds are "neutral" to the inputs/outputs of Defendants as to the WICR transaction.   The monies were Debtor's funds used to satisfy Debtor's obligations and do not factor into the calculation of the input or output of funds related to the Defendants.  Significantly, since the Trustee is now claiming only between $147,014.92- $149,534.92 in damages, the use of $175,950.58 in escrowed funds

---

[17] Ex. 9, Stewart Title's Escrow Accounting File Ledger reflecting that Chicago Title made seven wire transfers totaling $175,950.98 to Stewart Title on July 24, 2009; Ex. A, Transcript of Horne Dep. p. 166:20-p. 167:17 (testifying that the money from Chicago Title was held from prior closings and used to pay construction lienholders).

precludes a demonstration of any damages and supports summary judgment in favor of Defendants.

## VI. Trustee's Sur-Reply (#123)

Claiming the he was just presented with an updated completion costs summary (Ex. 25 to #123) from the Horne Defendants on April 6, 2012, the same date that the Trustee filed this sur-reply, the Trustee notes that the newly produced document shows that the costs to complete the 18 partially completed homes that were transferred to WICR was $547,525 above Defendants' cost estimate at the July 24, 2009 closing of the WICR transaction.  In addition the actual sale prices on the property were much lower than the projected sales, the difference amounting to $361,571, which explains the disappearance of Defendants' projected $2,000,000 profit from the WICR transaction.  See Ex. 26 (a pro forma produced by Biegler Defendants showing projected home and lot sale prices); Ex. 27, the HUD-1 closing statements for the WICR properties that have been sold; Ex. 28, a summary chart of this information.

The Trustee maintains that if one combines the cost overruns for completion with the amounts by which the properties undersold their projections, the total by which the actual numbers fail to meet Defendants' projections is only $909,096.  That figure only accounts for roughly half of the amount of the projected profit that has disappeared.  The Trustee insists this missing profit is a question of fact concerning the ultimate damage suffered by the

Debtor and must be decided by a jury.

**VII.  Horne Defendants' Reply (#124) to #119 and #123**

Incorporating the Biegler Defendants' reply to issues relating to the Chicago Title funding and the $500,000 payment to JEB, the Horne Defendants respond to the Trustee's damage calculations based on the funding provided by and into WICR and the issues raised in the Trustee's sur-reply.

The Trustee argues that only $145,000 of the funds provided by the Horne and Binash Defendants should be included in the calculation for the funds that were provided, supported by Horne's testimony that the Defendants over-funded WICR.  Horne actually said the following (Ex. 3, p. 52, ll. 11-5, to #119):

> Cash was available in WICR to be able to pay [the amounts funded by Wilshire Homes in connection with the SCR transaction] because Brian and I had over-funded the WICR closing.  And in that over-funding and the necessary funds to do that, there was cash available to be used by Wilshire Homes-Houston, which it did.

Horne's response to the question "Why is WICR advancing money to Wilshire Homes in connection with a closing that involved SCR 12/13?," just before the above statement, is enlightening (*id.* at ll. 3-8):

> Because as--as in all these instances, Brian and myself were funding money to various entities to help support Wilshire Homes Houston in order to get to its final conclusion, which was that--that viable we said was necessary in order for it to be a viable company.

The Horne Defendants note that the Trustee does not dispute that cash was actually put into the WICR, nor that the cash was utilized

directly by WICR, nor that it was funded to Wilshire Homes Houston to make payments necessary for Wilshire Homes Houston.  Instead the Trustee argues that any amount not used directly by WICR cannot be included in the calculation.  The money was used by WICR either directly or as funding for Wilshire Homes Houston.  For there to be any profit, and thus any damages, the returns must be greater than the outflow.  The Trustee has not disputed the cash-in, cash-out analysis attached to Horne's declaration, filed with the motion for summary judgment.  Horne Defendants insist that there have been and will be no profits in this case that could form the basis of damages for the Trustee.

The Horne Defendants further observe that in the Trustee's sur-reply the Trustee does not dispute the closing costs, but simply states without explanation that they create a fact issue. No pleading explains nor can rationally explain how the Trustee was damaged simply on the grounds that the cost to complete the homes was higher than the parties expected.

## VII.  Judge Isgur's Report and Recommendation

Judge Isgur agrees with both Defendant groups that the Trustee has not and cannot prove that the estate suffered any damages as a result of the WICR transaction, thus cannot prevail on any of his claims, and therefore recommended that this Court grant Defendants' motions for summary judgment.

Judge Isgur opined, "The appropriate measure of actual damages

-39-

is the amount of the Debtor's profit if the benefits of the WICR transaction had remained with the estate--specifically, if the Debtor had retained the Properties and benefitted from the reduction of the Franklin Bank Note. *ERI Consulting Engineers, Inc. v. Swinnea*, 318 S.W. 3d 867, 876 (Tex. 2010)." He concluded that "based on the summary judgment evidence [which focuses on WICR's expected profits from the transaction] . . ., the Debtor's reduction of the Franklin Bank Note and ability to develop and sell the Properties would have paralleled that of WICR." #1, p. 16. He further noted that "the unprofitability of the WICR transaction would also preclude any damages based on the alleged benefit to Horne and Binash, an alternative measure of damages asserted in paragraph 50 of the complaint [#102, at 15]."

The Horne and Biegler Defendants contend that WICR will not make any profit from the transaction, while the Trustee contends that the expected profits are between $147,014.92-$149,534.12.[18] The Horne and Biegler Defendants concur that WICR's profit or loss

---

[18] He summarizes the arguments for damages as follows: (1) the Biegler Defendants contend that the amount invested in WICR exceeded the anticipated proceeds and estimates that WICR would incur a loss of $330,294.00; (2) the Horne Defendants similarly estimate that WICR would incur a loss of $320,651.64; and (3) the Trustee estimates a profit of approximately $147,013.98 and argues (a) Horne and Binash's initial contribution was only $145,000 as opposed to Defendants' $429,338 and (b) the amount of escrowed funds of the Debtor used at the closing of the WICR transaction ($175,950.98 ) should offset WICR's reimbursement to Horne, Binash, and their affiliated entities. #1, pp. 8-9.

-40-

can be calculated by subtracting the amount of the remaining debt on the WICR note and the total reimbursed cash contributed by the Horne Defendants from the value of the remaining collateral, and both estimate that WICR will incur a loss of over $320,000. Arguing that WICR will make a profit between $147,014.92–$149,534.92 depending on which Defendant group's estimate of the remaining collateral is more nearly accurate, the Trustee estimates differs from Defendants' in two ways: (1) he thinks the initial funds contributed by Horne and Binash were only $145,000, not $429,448, so the money owed back to Horne, Binash and related entities is less, leaving more cash for WICR; and (2) the $175,950.98 contributed by the Debtor and held in escrow to pay off liens on the properties lowered Horne and Binash's initial contribution and should offset the funds owned back to Horne and Binash.

Judge Isgur concluded that he did not need to reach the issue of the amount of funds initially contributed by Horne and Binash because even assuming that the Court used the Trustee's number of only $145,000, no profit is anticipated. He explained that the Trustee erroneously offset the $175,950.98, held in escrow by Chicago Title from pervious sales of properties owned by the Debtor and used to pay off the two contractors' liens, against the amounts owed to Horne Binash and affiliated entities; when that amount is not counted as an offset, the alleged expected profit disappears.

He noted that the Trustee correctly pointed out that Defendants would have had to provide a larger initial investment if the $175,950.98 had not been available, but the Trustee incorrectly argues that this sum should be subtracted from the investment that the Defendants did make.  If Defendants had provided the $175,950.98, that amount would be part of their contribution in addition to the amount they actually contributed, and the $147,013 profit projected by the Trustee would disappear.

Even more important, the key is not what would have happened to WICR, Horne, Binash, or the other Defendants if the Debtor had not contributed the $175,950.98.  The correct measure of damages is the profit Debtor would have realized had Defendants not committed the alleged breach of fiduciary duty, conversion, usurpation or negligence, i.e., if Debtor had retained the properties and the Franklin Bank Note had been renegotiated on the Debtor's behalf. In such a case the Debtor would still have the $175,950.98, but the cash would still have had to be used to pay off the liens. Presumptively the sales price of the properties and the reduction of the Franklin Bank Note would have been the same if the Debtor had retained the project.  Judge Isgur drew a chart comparing the Trustee's projections for WICR with the Court's and concludes that the project would result in a net loss to the Debtor of $28,937.00 as indicated below:

**Trustee's Projections for WICR**

*Sources of Funds:*

| | |
|---|---:|
| Proceeds from Sold WICR Collateral held in escrow | $855,161 |
| Collateral held in escrow for sole remaining | |
|     home to be sold under contract | $195,783 |
| Approximate Net from Pending Lots | $144,683 |
| Approximate Net from Unsold Lots | $157,920 |

| | |
|---|---:|
| **Total Sources of Funds** | **$1,353,547** |

*Uses of Funds:*

| | |
|---|---:|
| Pay WICR Note Remaining Balance | $1,017,618 |
| Reimburse Cash Advances to Date: | |
|     Ed Horne CD | $250,000 |
|     Initial Funds Contributed by Horne and Binash | $145,000 |
|     Funds Advanced by Horne after WICR Closing | $19,866 |
|     Offset One-Time Distribution to Horne and Binash | ($50,000) |
|     Subtotal | $364,866 |

| | |
|---|---:|
| Offset Debtor's Funds used at Closing | ($175,951) |

| | |
|---|---:|
| Total Uses of Funds | $1,206.533 |

| | |
|---|---:|
| Expected Profit | $147,014 |

****************************************************************

**Court's Modification of Trustee's Projections**

*Sources of Funds:*

| | |
|---|---:|
| Proceeds from Sold WICR Collateral Held in Escrow | $855,161 |
| Sole Remaining Home to be Sold Under Contract | $195,783 |
| Approximate Net from Pending Lots | $144,683 |
| Approximate Net from Unsold Lots | $157,920 |
| Cash from Chicago Title Escrow | $175,951 |

| | |
|---|---:|
| **Total Sources of Funds** | **$1,529,498** |

*Uses of Funds:*

| | |
|---|---:|
| Pay Franklin Bank Note Recorded Balance | $1,017,618 |

| | |
|---|---:|
| Cash Loss to Date: | |
| Expenses paid with Ed Horne CD | $250,000 |
| Payment of M&M Liens with funds from Horne and Binash | $145,000 |
| Expenses paid with post-closi9ng Horne advance | $19,866 |

-43-

| | |
|---|---|
| Offset One-Time Distribution to Horne and Binash | ($50,000) |
| Subtotal | $364,866 |
| Pay Outstanding M&M Liens | $175,951 |
| **Total Uses of Funds** | **$1,558,435** |
| **Expected Loss** | **($28,937)** |

In response to the Trustee's argument in his sur-reply that out of Defendants' expectation of a $2,000,000 profit Defendants have accounted for only $909,096 of the shortfall in cost overruns for completions and amounts by which the properties undersold their projections, Judge Isgur responds that such speculation is insufficient to establish the Trustee's entitlement to damages.[19] He notes that the Trustee's initial response to the motions for summary judgment agreed that a comparison of inputs to expected outputs is the appropriate measure of damages. While viewing the facts alleged in a light most favorable to the Trustee, Judge Isgur

---

[19] This Court agrees. As the Fifth Circuit opined in *Homoki v. Conversion Services, Inc.*, 717 F.3d 388, 398-99 (5th Cir. 2013), under Texas law

> Lost profits must be proved by "competent evidence" with "reasonable certainty." *Texas Instruments v. Teletron Energy Mgmt.*, 877 S.W. 2d 276, 278-79 (Tex. 1994) . . . . While lost profits need not be susceptible to exact calculation, there must be data from which they can be ascertained with a reasonable degree of certainty and exactness. *Id.* Whether the evidence has shown a "reasonable certainty" of lost profits is a fact-intensive determination. *ERI Consulting Eng'rs, Inc. v. Swinnea*, 318 S.W. 3d 867, 876 (Tex. 2010). "As a minimum, opinions or estimates of lost profits must be based on objective facts, figures, or data from which the amount of lost profits can be ascertained. . . ." *Id.*

-44-

concluded that there was no evidence that the Debtor would have realized a profit by retaining the properties and renegotiating the Note.  Therefore there is no evidence that the Defendants' transfer of properties and renegotiation of the Note harmed the Debtor.  The Trustee's failure to prove any damages relating to the WICR transaction defeats his claims for breach of fiduciary duty, aiding and abetting breach of fiduciary duty, equitable subordination, usurpation of business opportunities, conversion of estate assets, violation of the Texas Theft Liability Act, and negligence, which all require evidence that the Debtor was harmed by the WICR transaction.

**VIII.  Plaintiff's Motion to File Out-Of-Time Objections to the Bankruptcy Judge's Report and Recommendation Pursuant to Fed. R. of Civ. P. 60(b) (#6 in H-12-1642)**

Because it would be efficient to address all the Trustee's objections to Judge Isgur's Report and Recommendation together, the Court considers this motion before the Trustee's previously filed objections.

Plaintiff states that new and material evidence has come to light since Judge Isgur issued his Report and Recommendation that would probably have changed the result of the bankruptcy judge's decision had it been considered.  He urges the Court to grant relief based on a showing of "newly discovered evidence which by due diligence could not have been discovered in time to move for a

new trial under Rule 59(b)" or "fraud (whether heretofore denominated intrinsic or extrinsic), misrepresentation, or other misconduct of an adverse party." Fed. R. Civ. P. 60(b)(2) & (3). Charging Defendants with deception in their motions for summary judgment, Plaintiff contends that they based their calculations on the sale of only 35 lots from Debtor to WICR, but that there was a 36th lot, owned by the Debtor, but encumbered by a lien in favor of JEB.

The Court will not go into the details of the Trustee's motion, because for the reasons set out in Defendants' objections in #8 and #11 to the Trustee's motion to file out-of-time objections, including procedural improprieties and untimeliness of the Trustee's motion to the fact that the information was public and readily available long ago, as well the Trustee's misrepresentations, inconsistent positions before the Bankruptcy Court, and reliance on hearsay as evidence, the Court denies the motion.

## IX. The Trustee's Objections Pursuant to Fed. R. Bankr. Proc. 9033 to the Bankruptcy Judge's Report and Recommendation (#2 in H-12-1642)

The Trustee timely filed two objections, which this Court reviews *de novo*.

First, the Trustee contends that Judge Isgur applied the wrong legal standard under Texas law concerning the breach of fiduciary

duty by improperly placing the burden of proof on the Trustee and
therefore erroneously concluding that Defendants' motions for
summary judgment should be granted.  Once a fiduciary relationship
has been established, as in this case, under Texas law the burden
of proof shifts to the fiduciary to show that the transaction was
fair.  The Trustee points to Judge Isgur's acknowledgment that the
Trustee argued that Defendants had expected to make $2,000,000
profit on the transaction, but that they have accounted for only
$909,096 of the shortfall.  Although Judge Isgur (Report and
Recommendation, #1 at p. 23) summarily dismisses this point in
determining that "such speculation is insufficient to establish the
Trustee's entitlement to damages," the Trustee insists that Judge
Isgur wrongly presumed that the burden of proof rests on the
Trustee.  Under Texas law, a fiduciary relationship creates a
special bond that requires the fiduciary to deal fairly and in good
conscience.  *Brewer & Pritchard, P.C. v. Johnson*, 7 S.W. 3d 862,
867 (Tex. App.-Houston [1ˢᵗ Dist.] 1999), *aff'd,* 73 S.W. 3d 193
(Tex. 2002).  Texas Courts have applied a presumption of unfairness
to transactions between a fiduciary and a party to whom he owes a
duty, imposing on the fiduciary (here Horne and Binash and/or
aiders and abettors Biegler and JEB) the burden of proving the
fairness of the transactions.  *Texas Bank & Trust Co. v. Moore*, 595
S.W. 2d 502, 508-09 (Tex. 1980)(when trust is reposed and
substantial benefits are gained, equity will recognize an informal

-47-

fiduciary relationship, i.e., that the beneficiary of the transaction is a fiduciary and under an obligation to establish the fairness of the transaction). In *Double Ace, Inc. v. Pope*, 190 S.W. 3d 18, 25, 26-27 (Tex. App.--Amarillo 2005, no pet.), the court of appeals overturned an instructed verdict, granted on the grounds that the plaintiff had introduced no evidence to show the transactions were unauthorized or inappropriate, because the trial court had erroneously imposed the burden of proof on the plaintiff. The appellate court stated that "because transactions between officers or directors of a corporation are subject to strict scrutiny, as former officers, [Defendants] had the burden of establishing the fairness of the transactions to the Corporation. Since transactions between [Defendants], as fiduciaries, are presumptively fraudulent, they had the burden to introduce evidence to establish the fairness of the transactions in which they were involved." *Id.* at 26.

In the instant case, Defendants, who were in a fiduciary relationship with Plaintiff, have not met their burden of proof to show that the transaction by which they breached their duty was fair to Plaintiff. Defendants have failed to account for over a $1 million shortfall in the money that they projected they would realize from their wrongdoing. The transaction here, which violated Defendants' fiduciary duty to Plaintiff, caused the transfer of real properties owned by Plaintiff to an off-balance-

sheet entity (WICR) owned by Defendants.  Defendants' projected $2,000,000 profit was based on (1) the projected sales prices for the properties and (2) the amount of money required to complete construction on the properties prior to their sale.  The Trustee presented evidence to show the actual sales prices for the properties and the actual amounts of money that Defendants claimed they spent to complete construction before their sales.  The difference between Plaintiff's projected numbers and the actual numbers is over $1 million, for which Defendants have not accounted.  Thus Defendants have failed to meet their burden to show the transaction  was fair and equitable to Plaintiff.  Therefore the Court should reject Judge Isgur's Report and Recommendation and deny Defendants' motions for summary judgment.

The Trustee's second objection is that Judge Isgur failed to rule on the Trustee's motion for leave to file his Fourth Amended Complaint to add a request for equitable fee disgorgement from the Biegler Defendants for the profits they realized from aiding and abetting the other Defendants in the breach of fiduciary duties. The motion is still live, and the Trustee urges this Court to consider it, or alternatively, to find that Judge Isgur abused his discretion by effectively denying the motion without comment as to his reasons and to review it *de novo*.  "Outright refusal to grant the leave without any justifying reason appearing for the denial is not an exercise of discretion; it is merely abuse of the discretion

-49-

and inconsistent with the spirit of the Federal Rules." *Foman v. Davis*, 371 U.S. 178, 182 (1962)("Rule 15(a) declares that leave to amend 'shall be freely given when justice so requires. . . . If the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits.").

## X.   Biegler Defendants' Response to Plaintiff's Objections (#3)

Explaining that after Horne and Binash transferred the collateral (properties and houses) for what the Biegler Defendants describe as "a significantly undersecured loan" to WICR, which Horne and Binash owned, Horne and Binash then refinanced the loan with Biegler's assistance and financial support.  #3 at pp. 1-2.[20] Defendants' motions for summary judgment contended that the actual proceeds obtained from the sales of the transferred collateral were not sufficient to satisfy even the reduced, refinanced loan obligations and that WICR ultimately made no profit from the transaction.   Therefore the Debtor's estate suffered no damages from the alleged breach of fiduciary duties because the Debtor would not have profited if the same refinancing transaction was consummated with the Debtor rather than with WICR.

Biegler Defendants observe that Plaintiff's objections to the Report and Recommendation do not challenge the Bankruptcy Court's

---

[20] Biegler Defendants claim that they had no interest in the Debtor and that their only participation in the transaction was as a good faith lender.

specific calculation of damages or the ultimate conclusion that Plaintiff failed to prove any damages.

Regarding Plaintiff's first objection that Judge Isgur erred by placing the burden on Plaintiff to prove a breach of fiduciary duty rather than on Horne and Binash to show the transaction was fair and equitable, the Biegler Defendants emphasize that this argument relates only to liability, not to damages, and has no connection to any finding of fact or conclusion of law made by the Bankruptcy Judge. The summary judgment motions were expressly limited to the issue of Plaintiff's inability to prove any damages. Furthermore, the objection has no merit because, as required in reviewing a motion for summary judgment, Judge Isgur expressly assumed that all of Plaintiff's allegations in the Third Amended Complaint were true; he assumed that Defendants were liable and then considered whether there would be any damages. #1 at p. 6 ("Assuming these allegations to be true, the Trustee can claim damages only for any loss of profits suffered by the Estate."). Thus there is no error in connection with the burden of proof as to liability because the issue was presumed in the Trustee's favor. This Court agrees.

As for the second objection that Judge Isgur failed to rule on the Trustee's motion for leave to amend for the fourth time, the Biegler Defendants first insist that the motion is not currently before this Court for consideration because the reference has not

been withdrawn and the Report and Recommendation is limited to the motions for summary judgment.  If this Court adopts the Report and Recommendations and grants the motions for summary judgment, the motion for leave to amend will be moot.  Second, if the Court considers it anyway, it should deny the motion because "a completely new equitable remedy at this stage in the litigation is tactical, dilatory, and reeks of desperation." Biegler Defendants' Reply Brief in Support of Motion for Summary Judgment, #122 at p. 3 in Adv. Proceeding 11-3297.  Biegler Defendants summarize the history of Plaintiff's "ongoing pattern to avoid adjudication by delay and continuously amending its pleadings," which the Court incorporates into this document and which clearly demonstrate that the Bankruptcy Court did not err in declining to address.  #3 at pp. 5-7 in H-12-1642.  They further note that the fourth motion for leave to amend was filed in response to the very motions for summary judgment which Judge Isgur addressed in his Report and Recommendation.

## XI. Joint Response of Horne Defendants to Plaintiff's objections (#4 in H-12-1643)

The joint response reiterates the arguments set out in the Biegler Defendants' response.  It notes that Plaintiff confuses the issue of a presumption of unfairness for liability purposes with the damages element of claims pleaded by Plaintiff in this action. It points out that Judge Isgur opined in his Report and

-52-

Recommendation that each of the claims and causes of action pleaded by the Plaintiff requires a showing of damages as an essential element (*id.* at pp. 14-16) and concluded that the appropriate measure of damages was the profit that the Debtor would have received but for the existence of the transactions of which Plaintiff complains (*id.* at pp. 8, 16).

Moreover, the summary judgment evidence submitted by all Defendants conclusively established, as Judge Isgur concluded, that there were no profits that would have been realized by the Debtor even if the transaction was improper.  Plaintiff's argument that because Defendants hoped or expected there would be a profit, they therefore must account for the shortfall between what was expected to be received and was actually received is illogical and is a red herring;  Judge Isgur repeatedly emphasized that the expectation of profit is not damages where no profit was actually realized.  #1 at pp. 6,8,16,20,21, and 23 ("Such speculation [as to anticipated profits] is insufficient to establish the Trustee's entitlement to damages.  The Trustee's initial response to the Motions for Summary Judgment concedes that a comparison of inputs to expected outputs is the appropriate measure of damages.").

Regarding the Trustee's second objection, they urge the Court to incorporate by reference their Joint Report to Plaintiff's Motion for Leave to Amend filed on April 5, 2012 (#121 in Adv. Proc. 11-3297) demonstrating that Judge Isgur had substantial

discretion in his decision not to grant leave to amend, especially in light of the multiple prior opportunities Plaintiff had to amend. *See generally Southmark Corp. v. Schulte Roth & Zabel (Matter of Southmark Corp.)*, 88 F.3d 311, 315-17 (5th Cir. 1996), *cert. denied*, 519 U.S. 1057 (1997).

## Court's Decision

As an initial matter, having reviewed the Trustee's objections *de novo*, the Court agrees with Defendants for the reasons they have stated that the Trustee's objections to Judge Isgur's Report and Recommendation lack merit and should be overruled.

Judge Isgur's Report and Recommendation satisfies the correct standard of review under Federal Rules of Civil Procedure 56 in reviewing Defendants' motions for summary judgment and in recommending that they be denied because the Trustee failed to meet his burden of proof on damages, an essential element of each of his claims.

Regarding his decision not to address the Trustee's motion for leave to file a Fourth Amended Complaint, the Court agrees for the legal principles and authority presented in Defendants' Joint Report (#121 in Adv. Proc. 11-3297), as well as the record of The Trustee's repeated amendments and delays, apparent from the docket sheets of the relevant actions encompassed in this action, that Judge Isgur as a matter of law did not abuse his substantial discretion in deciding not to grant the motion for leave to amend.

-54-

Under the procedural history of this Adversary Proceeding and the facts here, this Court finds Judge Isgur's decision not to address it very justifiable.  Motions for leave to amend are "entrusted to the sound discretion of the district court." *Quintanilla v. Texas Television, Inc.*, 139 F.3d 494, 499 (5th Cir. 1998).  The Trustee had already been allowed to amend his complaint three times even though each time there were pending motions to dismiss or for summary judgment. Defendants' current motions for summary judgment were on file when the Trustee asked leave to amend a fourth time. The discovery period, already extended, was about to expire.  The Trustee did not show any newly discovered evidence to justify continuing his pattern of repeated amendments and resulting delays. Thus Trustee has not shown good cause for the requested fourth amendment.  Denial of a motion for leave to amend under Fed. R. Civ. P. 15(a)(2) "may be warranted for undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies, undue prejudice to the opposing party, or futility of a proposed amendment." *United States ex rel. Steury v. Cardinal health, Inc.*, 625 F.3d  262, 270 (5th Cir. 2010).  There is no evidence to support the proposition that Judge Isgur's decision not to rule on the last motion for leave to amend was an abuse of discretion.

Furthermore, after a careful review of the full record of the Adversary Proceeding in the bankruptcy court and in the instant

action before the undersigned judge, this Court concludes that Judge Isgur carefully reviewed all the evidence, applied the standard of review and the appropriate law, and correctly determined that there was no evidence of damage to the Debtor because of the Defendants' transfer of the properties and homes to WICR, the purchase of the note by the Biegler Defendants, and the ultimate sale of the under-secured assets.

Accordingly, for the reasons stated above, the Court ORDERS the following:

(1) the Trustee's motion to file out-of-time objection to the Bankruptcy Judge's report and recommendation under Federal Rule of Civil Procedure 60(b)(#6 in H-12-1642) is DENIED;

(2) the Trustee's objections to that Report and Recommendation filed by the Trustee (#2 in this case) are OVERRULED;

(3) Bankruptcy Judge Marvin Isgur's Report and Recommendation (#1) is hereby ADOPTED as the Court's own; and

(4) the Biegler Defendants' motion for summary judgment (#111 in the Adversary Proceeding H-11-3297) and the Horne Defendants' motion for summary judgment (#112 in the Adversary Proceeding H-11-3297) are GRANTED.

**SIGNED** at Houston, Texas, this __11th__ day of __September__ , 2013.

_____

MELINDA HARMON
UNITED STATES DISTRICT JUDGE